**Glenn D. MITCHELL and Wilhelmina Mitchell, Plaintiffs,**

v.

**Judith A. CHONTOS, M.D., A.B. Hiedel, S.K. Will, and Richland Memorial Hospital, Defendants.**

Civ. A. No. 3:89–2164–6(B).

United States District Court, D. South Carolina, Columbia Division.

Dec. 20, 1990.

William Gary White, III, and John A. O'Leary, Columbia, S.C., for plaintiffs.

Julius W. McKay, II, Columbia, S.C., for defendant Chontos.

William H. Davidson, II, Columbia, S.C., for defendant Hiedel.

Leslie A. Cotter, Columbia, S.C., for defendants Will and Richland Memorial Hosp.

ORDER

SIMONS, District Judge.

This action, brought pursuant to 42 U.S.C. Sec.1983, comes before the court with the Report and Recommendation of the United States Magistrate. Plaintiff Glenn Mitchell was injured in a mugging in April, 1989. He was transported to the Richland Memorial Hospital emergency room for treatment of a gash on his forehead. His family was called at his request, and when they arrived, Defendant Chontos allegedly told them to put on rubber gloves because plaintiff suffered from AIDS. Plaintiff also contends that Defendant Chontos advised his family that they should not live in the same house with him. He contends that after treating his wound, Defendant Chontos told him to get dressed and leave, but he asked to be admitted to the hospital for treatment for a sickle cell crisis he believed he was suffering. Plaintiff contends that Defendant Chontos refused to admit him for this further treatment, and that at her direction, Defendant

---

**3.** (77 weeks × 6 hours × $7.50) + (13 weeks × 6 hours × $12.00).

Hiedel subdued him and placed him under arrest. Finally, he alleges that at the defendants' instigation, he was transported to the Richland County Detention Center and was incarcerated there overnight.

Based upon this incident, plaintiff sets out fifteen (15) causes of action. These include pendant state claims, as well as plaintiff's Section 1983 claim. Plaintiff, Wilhelmina Mitchell, the mother of Plaintiff Glenn Mitchell, is only involved in the pendant state claims.

Based upon his detailed review of the record, the Magistrate concluded that plaintiff has not shown that any of the defendants' alleged actions were taken under color of state law. Based on that conclusion, the Magistrate recommends that this case be dismissed because this court is without jurisdiction under 42 U.S.C. Sec. 1983. In addition to his extensive analysis of the pivotal question of state action, the Magistrate also noted that "[e]ven if Richland Memorial Hospital was a state actor, it could not be held liable for the actions of its employees unless plaintiff can show a policy which the employees were carrying out in their alleged denial of treatment." *Magistrate's Report* at 249, n. 9.

Plaintiff has filed Objections to the Magistrate's Recommendations which articulately urge that the defendants were acting under color of state law. On consideration of the matter, however, this court finds nothing in plaintiff's Objections which persuade it that the Magistrate's reliance on *Modaber v. Culpeper Memorial Hospital, Inc.*, 674 F.2d 1023 (4th Cir.1982), is incorrect. *See, also, Carter v. Norfolk Community Hospital Association, Inc.*, 761 F.2d 970 (4th Cir.1985). The court hereby adopts the Magistrate's Report and Recommendation, which is made a part of this Order by specific reference. On the basis set out therein, this case is hereby dismissed for lack of jurisdiction.

AND IT IS SO ORDERED.

---

1. This case under 42 U.S.C. § 1983 is before the undersigned United States Magistrate for all pretrial matters pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule

## MAGISTRATE'S REPORT AND RECOMMENDATION

May 1, 1990.

HENRY M. HERLONG, Jr., United States Magistrate Judge.

The plaintiffs have brought this suit under 42 U.S.C. § 1983, as well as several other United States Code sections.[1] They have also alleged a number of pendant state law claims. The defendants have all filed motions to dismiss, arguing that this court does not have jurisdiction because plaintiffs have failed to set forth a valid federal claim.

### FACTS

The facts out of which this case arose are set forth generally in the plaintiff's complaint at pages 3–6. Apparently, Plaintiff Glenn Mitchell was mugged on or about April 8, 1989. He was transported to the emergency room of the Richland Memorial Hospital, bleeding from a gash on his forehead. He requested that his family and private physician be called. Apparently his family was contacted, but not his physician. When the family arrived at the hospital, Defendant Chontos directed them to put on rubber gloves, telling them that the plaintiff suffered from AIDS and had "track marks up and down his legs from drug abuse." Plaintiff admits that the gash in his forehead was treated by Defendant Chontos, but alleges that she failed to clean the wound or examine any other injuries. He also alleges that she told his family they should not be living in the same house with him and made other comments related to his condition. After treating the wound to his forehead, Defendant Chontos told plaintiff to get dressed and leave.

The plaintiff then advised Defendant Chontos that he believed he was suffering from a sickle cell crisis and wished to be admitted to the hospital to be treated by his doctor. He alleges that Chontos re-

---

19.00 DSC. Because a dispositive motion is the subject of this report and recommendation, review by the court is required.

fused to admit him to the hospital, then at her direction, Defendant Hiedel grabbed the plaintiff by his left shoulder, grabbed him around his neck, striking his chest, and placed the plaintiff under arrest. At the direction of the defendants, plaintiff was transported to Richland County Detention Center where he was incarcerated overnight. The following day the plaintiff was returned to Richland Memorial Hospital for further treatment. He alleges that in the interim, Chontos conferred with Defendant Wills, informing Wills that the plaintiff was a troublemaker, that he had AIDS and should be sent away again if he returned. When the plaintiff returned to Richland Memorial Hospital for further treatment, Defendant Wills refused to treat him. The following day, April 10, 1989, plaintiff's private physician admitted him to the hospital for treatment of a broken shoulder blade, concussion, and other problems associated both with his mugging and with sickle cell syndrome. Following his release from the hospital, the plaintiff returned to the emergency room on April 17, 1989, where he was again denied treatment by Defendant Chontos.

Plaintiff alleges fifteen causes of action, set forth below:

1. Emotional outrage in that the defendants' conduct caused the plaintiff emotional distress, public humiliation, and embarrassment, infringed his right to privacy, and caused a variety of medical problems including headaches, nausea, and sleeplessness.

2. Emotional outrage in that Defendant Chontos informed the plaintiff, Wilhelmina Mitchell,[2] that Glenn Mitchell had AIDS and would give it to her, although Chontos knew that plaintiff Wilhelmina Mitchell was in poor health with high blood pressure and should avoid extreme excitement.

3. Gross negligence in that the defendants did not provide reasonably competent medical care to the plaintiff in a number of ways. (See Plaintiff's Complaint, pages 9–10).

4. Slander because the defendants informed Mitchell's family that he had AIDS and suffered from drug abuse.

5. Invasion of privacy because the defendants commented about plaintiff's medical condition to his family.

6.7.8. Battery (three causes of action) relating to the actions taken by Defendant Hiedel in that he grabbed the plaintiff by the left arm and jerked the arm, struck the plaintiff in his chest with his fist, and grabbed the plaintiff by the throat and choked him.

9. False arrest at the direction of the defendants.[3]

10. False imprisonment at the Richland County Detention Center at the direction of the defendants.

11. Abuse of process because the defendants had the plaintiff arrested.

12. Malicious prosecution of the plaintiff on charges of disorderly conduct.

13. Conspiracy to violate Mitchell's civil rights, "to deprive him of his liberty, of his health and life, to deny him equal protection of the laws and due process under the law and to otherwise violate his rights as has been heretofore set forth." (Plaintiff's Complaint, page 16).

14. Violation of Glenn Mitchell's civil rights in a number of ways including:

a. Denial of plaintiff's First Amendment right to freedom of speech;

b. Denial of plaintiff's Fourth Amendment right to be free from unreasonable search and seizure;

c. Denial of plaintiff's Fourth and Fifth Amendment right to be free from intrusions into his right of privacy;

d. Violation of plaintiff's Fifth and Fourteenth Amendment rights not to

---

**2.** Because the only causes of action which Mrs. Mitchell can pursue are the pendent state claims, all later references to "plaintiff" in this report are references to Glenn Mitchell.

**3.** Plaintiff does not allege whether his false arrest occurred at the time he was taken into custody by Defendant Hiedel or at the time he was taken into custody by the police, who transported him to Richland County Detention Center.

be deprived of life, liberty or property without due process of law;

e. Violation of plaintiff's Fourteenth Amendment right of equal protection under the law; and

f. Denial of plaintiff's rights and privileges under the laws of the United States and the State of South Carolina.

15. Plaintiff requests a restraining order to prevent the defendants from further publicizing the plaintiff's private medical records.

## JURISDICTION

Plaintiff has filed this action under several United States Code sections, including 28 U.S.C. §§ 1331, 1343 and 1441(c) and under 42 U.S.C. §§ 1983 and 1988.

Section 1331 allows districts courts to have original jurisdiction of civil actions which arise under the Constitution, laws or treaties of the United States. Section 1343 specifically gives the district courts original jurisdiction of civil rights actions brought under §§ 1985 or 1983. Section 1441(c) provides for the removal of actions from state court to federal court where actions brought under state law are joined with actions brought under federal jurisdiction. Section 1983, the primary basis for jurisdiction of the plaintiff's lawsuit, provides in part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof, to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Section 1988 allows attorneys fees to be awarded in cases where recovery is had by the plaintiff under § 1983.[4]

As pointed out by the defendants in memoranda in support of their motions to dismiss and as required by the statute, the plaintiffs must meet two requirements to bring suit under § 1983. They must show a deprivation "under color of" state law and the deprivation must be of a right guaranteed by the Constitution or laws of the United States. In their memoranda, the defendants have focused primarily on arguments that the deprivation claimed by the plaintiffs was not of any constitutional right. Review of plaintiffs' complaint, however, shows that the most obvious deficiency is the lack of any "state action" in the events which they allege.

The plaintiffs allege in their complaint that Richland Memorial Hospital is a "municipal corporation." (See Plaintiff's Complaint, page 3). South Carolina law defines a municipality as a city or town which has been incorporated under South Carolina law, South Carolina Code § 5–1–20 (1976, as amended). Incorporation occurs when the Secretary of State issues a corporate certificate to the municipality after ascertaining that certain conditions have been met. South Carolina Code § 5–1–30 (1976). These conditions include the requirement that an election has been held to decide, among other questions, *the form of government* of the new municipality, S.C. Code § 5–1–50 (1976). South Carolina law clearly contemplates that a municipality is a defined geographic area with a population of permanent residents. See S.C.Code § 5–1–80 (1976).

By contrast, counties may undertake the construction and funding of hospitals under S.C.Code Sections 44–7–610 *et seq.* and 44–7–910 *et seq.* (1976). In general, hospitals will not meet the definition of a municipal corporation, nor does a hospital have the powers given to municipalities by South Carolina law. These powers include the power to make law, levy and collect taxes, grant and regulate franchises and licenses, and borrow against and pledge revenues. S.C.Code § 5–7–30 (1976, as amended). Hospitals are empowered to make "rules" only for the operation of the facility and

---

**4.** Section 1988 is intended to complement other civil rights laws, but does not set forth a separate cause of action. *Moor v. Alameda County,* *California,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596, *rehearing denied* 412 U.S. 963, 93 S.Ct. 2999, 37 L.Ed.2d 1012 (1973).

the employment of its staff, S.C.Code § 44–7–1060 (1976).

Because Richland Memorial Hospital is not a municipal corporation, as alleged by the plaintiff, the court must consider whether there is any "state action" which is required for jurisdiction under § 1983. In determining whether a particular entity can be considered an arm of the state, the court is required to look to the "nexus" between the state and the organization.[5]

A state and another entity may interact in several ways without giving rise to state action by the entity. Naturally, however, when a certain degree of interaction is reached, actions taken by that entity may be considered actions taken by the state. Several degrees of interaction are permissible, however, before reaching that level. The state regulates many businesses, organizations, and professions, but the mere regulation of a private group or person does not make their actions those of the state. For example, utilities in most states are heavily regulated, but this regulation does not transform every action by the utility into one taken under color of state law. See *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

A higher degree of interaction may be found where the state employs and/or pays a person. Even in that situation, the person's actions are not always considered to be taken under color of state law. An example is the employment of public defenders by the state to represent indigent defendants. Although these attorneys are employed and paid by the state, the nature of their relationship with the defendants is private. The attorney's actions and decisions are made on behalf of his client, not under direction from the state. For these reasons, public defenders, even though paid by the state, are not acting under color of state law, *Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).

The highest degree of interaction between the state and a private party, and the degree necessary before a private party can be considered to act under color of state law, exists only where the state is dictating the course of conduct or is lending its authority to the action taken. In a 1974 decision, the Supreme Court declined to find the necessary interaction between a privately owned utility, even where that utility was heavily regulated by the state, operated in a semi-monopoly situation, supplied an essential public service, and performed a "public function." In *Jackson v. Metropolitan Edison Company, supra,* the court stated that despite these findings, the utility was not acting under color of state law.

> "If we were dealing with the exercise by Metropolitan of some power delegated to it by the state which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one. But while the Pennsylvania statute imposes an obligation to furnish service on regulated utilities, it imposes no such obligation on the state." *Jackson supra,* at 353, 95 S.Ct. at 454.

Further consideration of the *Jackson* case reveals a strong similarity to the question in the case at issue. In *Jackson*, the plaintiff's electric service was terminated for both non-payment and suspected tampering with the electric meter. The plaintiff brought suit alleging that the utility's termination of service without due process, i.e. without a hearing, violated her civil rights. As part of her argument, she noted that a Pennsylvania state statute required the reasonably continuous provision of electric service to state customers. As the court noted above, however, state law obligated the utility to furnish service; there was no obligation on the *state* to furnish electric service, nor is the supply of electricity a traditional state function or power. Inherent in the court's decision was a finding that an action must be one traditionally reserved to the state before the exercise of

---

**5.** The alleged state action in this case would actually be considered action taken by the county which is a political subdivision of the state. To avoid confusion, all references are made to state action because cases generally discuss the question of state action under § 1983 without specifying whether the action is actually taken by a state or one of its political subdivisions.

that action by a private party can be considered to be performed under color of state law. The provision of electric service is not an activity traditionally reserved to the states, such as taxation, therefore, the failure to provide this service by a private party cannot be considered to have occurred under color of state law.

A similar analysis can be applied to the provision of medical services by a hospital. The state has never traditionally guaranteed the provision of medical services to its citizens. Importantly, state law does not require the hospital to treat patients. See S.C.Code § 44–7–1070 (1976). The provision of those services by a third party does not transform that party into a state actor, even where the hospital is supported by public funds.

The sources of funding for the hospital, however, do not answer the question whether the hospital is acting under color of state law. The Court of Appeals for the Fourth Circuit has held that the receipt of Hill–Burton funds (42 U.S.C. § 291 *et seq.*) is irrelevant in determining the existence of state action, *Modaber v. Culpeper Memorial Hospital et al.*, 674 F.2d 1023 (4th Cir. 1982).[6] Likewise, the fact that a county hospital is built with tax dollars and federal money is irrelevant to a finding of state or county action, *Greco v. Orange Memorial Hospital Corporation*, 513 F.2d 873, 881 (5th Cir.1975). All questions lead back to the "nexus" between the state and Richland Memorial Hospital. In *Modaber, supra*, after noting that the *Jackson* decision was controlling, the court noted:

"Recipient hospitals undoubtably 'operate as integral parts of comprehensive joint or intermeshing state and federal plans and programs designed to effect proper allocation of available medical and hospital services for the best possible promotion and maintenance of public health.' ... But, the mere fact that the hospitals implement a governmental program does not establish the nexus which *Jackson* requires. The recipients do not act in an exclusively state capacity. Although health care is certainly an 'essential public service' it does not involve the 'exercise by a private entity of powers traditionally exclusively reserved to the State.' ... Although the hospitals are within a legislative design to better public health and are subject to extensive regulation, they remain solely responsible for providing the service and solely entitled to the profits therefrom." (*Modaber, supra* at 1026 (citations and footnotes omitted)).

In short, hospitals are not state actors within the meaning of § 1983.

As noted above in *Jackson, supra*, one requirement for a finding of state action is the exercise of some power or prerogative traditionally reserved for the exclusive use of the state. The provision of health care is clearly not a traditional state power. Although the state chooses to assist the public in obtaining adequate health care and services, the provision of hospital services is clearly not an area in which only the state operates.[7]

As was briefly mentioned in the above discussion, the court must also consider the nature of the relationship between the hospital and the plaintiff/patient in this case. Once the hospital has undertaken the treatment of a patient, the relationship between the hospital/doctors and the patient becomes private, such as that found in cases involving attorneys and clients. See *Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct.

---

6. *Modaber, supra* specifically overruled earlier holdings by the Fourth Circuit, at least to the extent those decisions conflicted with the *Jackson* case, decided in 1974.

7. In a case decided after *Jackson, supra,* but on different grounds, the Court of Appeals for the Fourth Circuit found that a hospital *did* act under color of state law. After the United States Supreme Court decided *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), striking down state laws banning all abortions, a West Virginia hospital refused to allow abortions to be performed, specifically relying on the West Virginia law outlawing abortion which had not been repealed following *Roe*. In *Doe v. Charleston Area Medical Center, Inc.*, 529 F.2d 638 (4th Cir.1975), the court found that the hospital, by adopting an invalid state law as its policy, was acting "under color" of state law because it was allowing the state to dictate a policy which deprived Doe of her constitutional rights. In other words, the hospital allowed the state to dictate its policies by continuing to follow the invalid statute.

445, 70 L.Ed.2d 509 (1981). Even if the plaintiff were able to show that the doctors and other defendants in this case were paid directly or indirectly by the state (or county), the relationship is clearly a private one, not regulated by the state. The doctor's decisions are dictated by the patient's needs, not by any state policy.

The plaintiff admitted in his complaint that he did receive treatment from Dr. Chontos for his head wound, which was stitched and that he protested her direction to leave the emergency room. He also admits that he had a private physician (an alternative source of care) who eventually admitted him to the hospital.[8] Any claim of such a policy is negated by plaintiff's later admission to the hospital.[9]

A review of the plaintiff's complaint indicates that his first twelve causes of action do not allege violations of any constitutional rights, but only state law tort claims. His thirteenth cause of action is only a vague allegation of a violation of his constitutional rights, without stating what right was violated. As clearly shown above, there is no constitutional right to medical care, absent some special duty by the state such as the incarceration of the plaintiff. Although plaintiff refers to his race and handicap in this cause of action, he has alleged no additional facts to support a claim of race discrimination or discrimination on the basis of a handicap. The fourteenth cause of action alleges a variety of rights which the plaintiff claims were violated. The problem here is that his constitutional rights are guaranteed against violation by the federal or state government, through the Fourteenth Amendment due process clause, but a violation by private parties is not actionable. The Supreme Court has noted that the Fourteenth Amendment "erects no shield against mere-

ly private conduct, however discriminatory or wrongful." *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). In short, there can be no claim of a constitutional violation based on the Fourteenth Amendment (or under § 1983) if the state is uninvolved in the allegedly wrongful conduct, *Great American Federal Savings and Loan Association et al. v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Because the court is without jurisdiction, equitable relief in the form of a restraining order, as requested in plaintiff's fifteenth claim, is unavailable.

As discussed above, the plaintiff has not shown that any actions were taken under color of state law. That showing is absolutely necessary to invoke this court's jurisdiction under 42 U.S.C. § 1983. The case should be dismissed because this court lacks jurisdiction.

---

**8.** The cause of liability against doctors employed by the state to treat prisoners is the lack of an alternative source of treatment. *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1989). The inmates are at the mercy of the state for any and all health needs. If the state refuses to provide care or the care provided is grossly inadequate, the inmate *cannot* seek care from any other source. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), reh'g denied, 429 U.S. 1066, 97 S.Ct. 798, 50

L.Ed.2d 785 (1977). The plaintiff here had an alternative source of health care.

**9.** Even if Richland Memorial Hospital was a state actor, it could not be held liable for the actions of its employees unless plaintiff can show a policy which the employees were carrying out in their alleged denial of treatment. *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).